37 A.3d 1122

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOHN WESSELLS, DEFENDANT–APPELLANT.

Argued January 6, 2010—Remanded June 4, 2010—Reargued November 30, 2011—Decided February 29, 2012.

396

John J. McMahon, Chief Trial Attorney, argued the cause for appellant (*Joseph E. Krakora*, Public Defender, attorney).

*Hilary L. Brunell*, Executive Assistant Prosecutor and *Debra G. Simms*, Deputy Chief Assistant Prosecutor, argued the cause for respondent (*Carolyn A. Murray*, Acting Essex County Prosecutor, attorney).

*Robert E. Bonpietro* and *Ashlea D. Thomas*, Deputy Attorneys General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow*, Attorney General, attorney).

Justice HOENS delivered the opinion of the Court.

This appeal turns on whether police questioning of defendant John Wessells following his arrest violated his previously-invoked right to counsel and therefore rendered the statements he made at that time involuntary. Our answer to that question rests on both the meaning of and the retroactive effect to be given to the decision of the United States Supreme Court, issued after the events in question, analyzing the implications of a break in custody following the invocation of a right to counsel. *See Maryland v. Shatzer*, —— U.S. ——, 130 *S.Ct.* 1213, 175 *L.Ed.*2d 1045 (2010). Our consideration of those issues leads us to conclude that because defendant has not yet been tried for the crimes with which he has been charged, he is entitled to the benefit of the United States Supreme Court's decision in *Shatzer* and that the statements he made during his second interrogation must therefore be suppressed.

## I.

On September 3, 2006, defendant was arrested at his home in connection with an outstanding traffic warrant. The arrest was made by Newark Homicide Detective Murad Muhammad and Essex County Prosecutor's Office Detective Marquise Carter. At the time, they were involved in investigating an incident that had taken place the previous day and in which three people had been shot to death and two others had been wounded. The police investigation into that incident had already led to the arrest of a suspect, Raheem Clay, who had been charged as a conspirator.

Defendant was taken to police headquarters where he was advised of his rights, *see Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), both orally and in writing. He read and signed the written form, indicating that he understood his rights and that he agreed to waive them. As part of the questioning that followed, the detectives asked defendant about an incident on August 24 involving Sandra Bellush, one of the homicide victims. Defendant admitted that he and Bellush had an argument at that time about money that Bellush believed defendant owed her. Defendant also told them that when he and Bellush could not resolve their dispute, he was assaulted by three of Bellush's friends. The September 3, 2006 interrogation ended [1] without defendant making any further inculpatory statements and he was released from custody after posting bail on the outstanding traffic warrants.

After defendant's release, the police continued their investigation into the triple homicide. As part of that investigation, they interviewed the two survivors, one of whom identified defendant as having been involved in the shootings. Based on that information,

---

[1] Defendant and the detectives disagreed about the reason why the interrogation was terminated. In testimony taken in connection with his suppression motion, defendant asserted that the police stopped questioning him because he invoked his right to counsel. Detective Muhammad testified that the questioning merely stopped because defendant had answered all of the questions that they had at that time and that defendant had never asked to speak with an attorney.

on September 12, 2006, defendant was again taken into custody for questioning. The September 12, 2006, interrogation was recorded. Defendant was again advised of his rights, which he again waived. In his statement to the police, he admitted that he had been present during the homicides and shootings and he identified both Clay and another person as being involved. He again admitted that he had been having a dispute with Bellush over money and asserted that her friends had assaulted him in August. He denied that he had any responsibility for the shootings.

Defendant was arrested and charged with first degree conspiracy to commit murder, *N.J.S.A.* 2C:5–2 and: 11–3(a); purposeful or knowing murder by use of a handgun, *N.J.S.A.* 2C:11–3(a)(1), (2); third degree unlawful possession of a handgun, *N.J.S.A.* 2C:39–5(b); second degree possession of a handgun for unlawful purposes, *N.J.S.A.* 2C:39–4(a); first degree attempted murder, *N.J.S.A.* 2C:5–1 and: 11–3(a); second degree aggravated assault, *N.J.S.A.* 2C:12–1(b); conspiracy to commit aggravated arson, *N.J.S.A.* 2C:5–2 and :17–1(a); and second degree aggravated arson, *N.J.S.A.* 2C:17–1(a).

Defendant moved to suppress the statements he made during both of the interrogations. At a hearing conducted on the motion, the focus was on defendant's waiver of his *Miranda* rights. As its evidence, the State offered the *Miranda* waiver form that defendant signed before the September 3 interrogation. That waiver form included a statement that the interview would include questions regarding the Bellush homicide. Although defendant confirmed that he had signed the form, he testified that it did not include any reference to the Bellush homicide when he signed it, implying that the officers had added that information later.

During his direct testimony, defendant asserted that when the detectives started asking about the murders, he denied knowing anything about them and asked to speak with a lawyer. When he was cross-examined, defendant acknowledged that he responded to many questions before asking to speak with a lawyer, for example, telling the detectives that he had lived with Bellush in

July 2006 and giving them some contact information for Clay. He also asserted that he asked to speak with a lawyer when he was asked about having been a victim in the August 24 incident. Notwithstanding that inconsistency, defendant has never suggested that questioning continued after he invoked his right to counsel, instead conceding that as soon as he asked for a lawyer, the interrogation stopped.

The trial court denied defendant's motion to suppress his September 3 statements, concluding that he had been informed about the purpose of the interrogation and had waived his rights prior to making the statements that he made on that day to the investigators. However, without explicitly finding that the questioning had stopped based on defendant's asserted invocation of his right to counsel, the court concluded that the reinitiation of questioning on September 12 violated defendant's constitutional rights.

The Appellate Division granted the State's motion for leave to appeal and, in a published opinion, reversed the order suppressing the statements defendant made on September 12. *State v. Wessells*, 408 *N.J.Super.* 188, 197, 974 *A.2d* 427 (App.Div.2009). The panel reasoned that once defendant was released from custody, he was afforded an adequate opportunity to consult with counsel. The panel noted that when the investigators reinitiated questioning, defendant was again advised of his *Miranda* rights and that his waiver of those rights was knowing and voluntary. *Ibid.* The panel based its conclusion about the effect of a break in custody on its analysis of prevailing federal jurisprudence, *see id.* at 193–96, 974 *A.2d* 427, and its separate consideration of principles surrounding the protections afforded by our State Constitution, *id.* at 196–97, 974 *A.2d* 427.

We granted defendant's motion for leave to appeal. 200 *N.J.* 364, 981 *A.2d* 1276 (2009). Following oral argument before this Court in January 2010, the United States Supreme Court issued its opinion in *Shatzer, supra*, —— *U.S.* ——, 130 *S.Ct.* 1213, 175 *L.Ed.2d* 1045, which analyzed the implications of a break in custody, following an assertion of the right to counsel, when

interrogation is reinitiated by the investigating authorities. Because the trial court's original analysis of this defendant's suppression motion had not included a factual finding on the disputed issue of why the September 3 interrogation had ended, we remanded the matter to the trial court to conduct a further proceeding. We directed the trial court to make a finding about whether defendant had in fact invoked the right to counsel on September 3, 2006.

On remand, the trial court made a series of factual findings. The court found that the detectives questioned defendant on September 3 about the triple homicide, that defendant invoked his right to counsel in response to those questions, and that the interrogation ceased because of the invocation of the right to counsel. In addition, the trial court found that when defendant was taken into custody for further questioning on September 12, he was again advised of his constitutional rights in accordance with *Miranda* and that his waiver of those rights was both voluntary and knowing.

## II.

Following the issuance of the trial court's findings and conclusions, we invited further briefing from the parties directed to the implications of those supplemental findings as well as to what effect, under the circumstances, should be given to the United States Supreme Court's *Shatzer* decision.

In supplemental briefing, the State notes that strict application of federal retroactivity rules would entitle defendant, who has not yet been tried for any of the crimes with which he was charged, to the benefit of the *Shatzer* decision. The State contends, however, that the rule the United States Supreme Court created in *Shatzer*, which bars renewed interrogation prior to the passage of fourteen days, is not a constitutional mandate. Viewing the rule instead as a judicially-created prophylaxis, the State argues that it merely altered the presumptions that weigh in the balance of factors to be considered in deciding whether statements made following any

break in custody are voluntary. The State therefore urges this Court to look to our own retroactivity rules and to conclude that because there is no deterrent purpose to be achieved by applying *Shatzer* to the police conduct in this case which has already occurred, it should not be applied.

Defendant asserts that application of federal retroactivity rules demands that *Shatzer* be applied retroactively to him. Moreover, disagreeing with the State's interpretation of its meaning, defendant argues that the United States Supreme Court created a bright line approach mandating that we interpret a fourteen-day break to be the minimum permissible period. He therefore urges us to conclude that the statements he made on September 12, because they were made following only a nine-day break in custody, must be suppressed.

## III.

Although the narrow issue before this Court is the retroactive effect of the United States Supreme Court's recent decision in *Shatzer*, the parties have raised broader questions concerning the implications of the test the United States Supreme Court established. Our analysis of the meaning and intent of the rule announced in *Shatzer* requires that we briefly trace the evolution of the break in custody jurisprudence at the federal level.

## A.

█ As the United States Supreme Court has held, once a suspect in custody invokes his right to counsel, the interrogation "must cease," and "the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Miranda, supra,* 384 *U.S.* at 474, 86 *S.Ct.* at 1627–28, 16 *L.Ed.*2d at 723. Although demonstrating that an individual has validly waived his or her right to counsel long required a showing that the waiver was knowing, voluntary and intelligent, *id.* at 475, 86 *S.Ct.* at 1628, 16 *L.Ed.*2d at 724, it was not until 1981 that the United States Supreme Court first consid-

ered what standard should apply to test the voluntariness of a waiver of the right to counsel once it had been invoked. *See Edwards v. Arizona*, 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378 (1981). Concluding that an additional safeguard was needed to ensure that an apparent waiver under those circumstances was indeed knowing, voluntary and intelligent, the United States Supreme Court created what has since become known as the *Edwards* rule. The Court held that a suspect who has invoked his or her right to counsel "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 *S.Ct.* at 1885, 68 *L.Ed.*2d at 386.

Thereafter, the United States Supreme Court held that the *Edwards* rule applied to any subsequent interrogation, whether it pertained to the crime that prompted the initial interrogation or to a different crime. *See Arizona v. Roberson*, 486 *U.S.* 675, 683–84, 108 *S.Ct.* 2093, 2098–99, 100 *L.Ed.*2d 704, 714–15 (1988). The Court observed that the *Edwards* rule served an important purpose because it was "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 *U.S.* 344, 350, 110 *S.Ct.* 1176, 1180, 108 *L.Ed.*2d 293, 302 (1990). The Court further expanded the rule's reach, concluding that, once the right to counsel was invoked, a suspect who consulted with an attorney had not suspended his prior invocation of his right to counsel, such that statements made during a second interrogation without counsel violated his previously-asserted constitutional right. *Minnick v. Mississippi*, 498 *U.S.* 146, 153, 111 *S.Ct.* 486, 491, 112 *L.Ed.*2d 489, 498 (1990) (applying rule to questioning by different investigating authority). The Court referred to the *Edwards* prohibition as a "bright-line rule," *Roberson*, 486 *U.S.* at 681, 108 *S.Ct.* at 2098, 100 *L.Ed.*2d at 714, and in a subsequent opinion described it as a "second layer of prophylaxis," *McNeil v. Wisconsin*, 501 *U.S.* 171, 176, 111 *S.Ct.* 2204, 2208, 115 *L.Ed.*2d 158, 167 (1991).

Notwithstanding the apparent breadth of that approach, the Court, perhaps in response to concerns raised by the dissenting Justices about the potential reach of its "irrebuttable presumption," *see Minnick, supra,* 498 *U.S.* at 156, 111 *S.Ct.* at 493, 112 *L.Ed.*2d at 500 (Scalia, J., dissenting), signaled the possibility that there might be an exception to the otherwise broad application of the *Edwards* rule. *See McNeil, supra,* 501 *U.S.* at 177, 111 *S.Ct.* at 2208, 115 *L.Ed.*2d at 167–68. In *McNeil,* the Court, albeit only through the device of a parenthetical aside, opened the door for a different approach if, unlike all of the previously-decided cases, *see, e.g., Minnick, supra,* 498 *U.S.* at 148–49, 111 *S.Ct.* at 488–89, 112 *L.Ed.*2d at 494–95; *Roberson, supra,* 486 *U.S.* at 678, 108 *S.Ct.* at 2096, 100 *L.Ed.*2d at 711; *Edwards, supra,* 451 *U.S.* at 479, 101 *S.Ct.* at 1882, 68 *L.Ed.*2d at 382–83, a defendant who had invoked the right to counsel had been released from custody in the interim. In reiterating the *Edwards* rule, the Court observed that "[i]f the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial[.]" *McNeil, supra,* 501 *U.S.* at 177, 111 *S.Ct.* at 2208, 115 *L.Ed.*2d at 167–68.

Following *McNeil,* state and federal courts uniformly interpreted its comment to be an acknowledgement by the United States Supreme Court that there is a break-in-custody exception to the presumption announced in *Edwards*.[2] The time frames that the

---

[2] The Supreme Court's recent decision in *Montejo v. Louisiana,* 556 *U.S.* 778, 129 *S.Ct.* 2079, 173 *L.Ed.*2d 955 (2009), overruling *Michigan v. Jackson,* 475 *U.S.* 625, 106 *S.Ct.* 1404, 89 *L.Ed.*2d 631 (1986), which had forbidden police to initiate interrogation of a criminal defendant after he requested counsel at an arraignment or similar proceeding, is not inconsistent with acknowledging the break-in-custody exception. Because the defendants in *Montejo* and *Jackson* had been arraigned at the time of the interrogations, those cases concern the Sixth Amendment right to counsel. In explaining its decision to overrule *Jackson,* the Court noted that under the *Miranda–Edwards–Minnick* line of cases, a defendant who does not want to speak to the police in the absence of counsel need only say so; as such, the Fifth Amendment protections afforded suspects make the Sixth

courts found to be sufficient for purposes of the break-in-custody exception, however, varied widely. *See, e.g., United States v. Harris,* 221 *F.*3d 1048, 1053 (8th Cir.2000) (finding three-hour break sufficient); *Kyger v. Carlton,* 146 *F.*3d 374, 381 (6th Cir.) (finding ten-day break sufficient), *cert. denied,* 525 *U.S.* 1028, 119 *S.Ct.* 565, 142 *L.Ed.*2d 471 (1998); *United States v. Bautista,* 145 *F.*3d 1140, 1150 (10th Cir.) (finding six-day break sufficient), *cert. denied,* 525 *U.S.* 911, 119 *S.Ct.* 255, 142 *L.Ed.*2d 210 (1998); *United States v. Barlow,* 41 *F.*3d 935, 945–46 (5th Cir.1994) (holding any break in custody sufficient), *cert. denied,* 514 *U.S.* 1030, 115 *S.Ct.* 1389, 131 *L.Ed.*2d 241 (1995); *Dunkins v. Thigpen,* 854 *F.*2d 394, 397 (11th Cir.1988) (holding any break in custody sufficient), *cert. denied,* 489 *U.S.* 1059, 109 *S.Ct.* 1329, 103 *L.Ed.*2d 597 (1989); *McFadden v. Garraghty,* 820 *F.*2d 654, 661 (4th Cir.1987) (finding one-day break sufficient); *United States v. Skinner,* 667 *F.*2d 1306, 1309 (9th Cir.1982) (finding one-day break sufficient), *cert. denied,* 463 *U.S.* 1229, 103 *S.Ct.* 3569, 77 *L.Ed.*2d 1410 (1983); *see also Kochutin v. State,* 875 *P.*2d 778, 779–80 (Alaska Ct.App.1994) (vacating previous suppression of statements based on new evidence revealing break in custody between defendant's two interrogations); *People v. Storm,* 28 *Cal.*4th 1007, 124 *Cal.Rptr.*2d 110, 52 *P.*3d 52, 62 (2002) (finding two-day break sufficient), *cert. denied,* 537 *U.S.* 1127, 123 *S.Ct.* 899, 154 *L.Ed.*2d 812 (2003); *State v. Alley,* 841 *A.*2d 803, 809–10 (Me.) (holding six-hour break sufficient when coupled with reasonable opportunity to contact counsel), *cert. denied,* 541 *U.S.* 1078, 124 *S.Ct.* 2425, 158 *L.Ed.*2d 992 (2004); *State v. Warren,* 348 *N.C.* 80, 499 *S.E.*2d 431, 440–41 (holding six-week break in custody sufficient), *cert. denied,* 525 *U.S.* 915, 119 *S.Ct.* 263, 142 *L.Ed.*2d 216 (1998); *Tennessee v. Furlough,* 797 *S.W.*2d 631, 640–41 (Tenn.Crim.App.1990) (holding two-and-one-half hour break sufficient); *Commonwealth v. Gregory,* 263 *Va.* 134, 557 *S.E.*2d 715, 723–24 (holding twelve-day break in custody sufficient), *cert. denied,* 537 *U.S.* 838, 123 *S.Ct.* 156, 154

---

Amendment protections in overlapping situations redundant. *Montejo, supra,* 556 *U.S.* at 795, 129 *S.Ct.* at 2090, 173 *L.Ed.*2d at 968–69.

L.Ed.2d 59 (2002); *Quinn v. Commonwealth*, 25 *Va.App.* 702, 492 *S.E.*2d 470, 475 n. 1 (1997) (holding any break in custody sufficient).

The theory that supported the break-in-custody exception to the *Edwards* rule was a simple one. It was based on the presumption that any suspect, once released from custody following an invocation of the right to counsel, would be entirely removed from the coercive environment of a police interrogation and would be free to consult with counsel of the suspect's choosing. *See, e.g., Bautista, supra,* 145 *F.*3d at 1150; *Dunkins, supra,* 854 *F.*2d at 397. One court noted that the suspect would be equally free to consult with family and friends to secure advice about whether to engage in further communications with police, an option that the court found would also be sufficient to dissipate the taint of coercion. *See Skinner, supra,* 667 *F.*2d at 1309.

Courts applying the *McNeil* exception considered, as part of their decision-making calculus, the duration of the time spent out of custody, reasoning that the longer that any particular suspect was free from coercive pressure, the greater the dissipation of that pressure became. *See, e.g., Bautista, supra,* 145 *F.*3d at 1150; *Storm, supra,* 124 *Cal.Rptr.*2d 110, 52 *P.*3d at 62. Regardless of whether a suspect actually took the opportunity to seek the advice of counsel, courts concluded that the opportunity to do so, if of sufficient duration, removed the taint of coercion and made reinitiation of interrogation by the authorities permissible. *See, e.g., Kyger, supra,* 146 *F.*3d at 381; *Alley, supra,* 841 *A.*2d at 809–10.

Over time, courts expressed concerns that absent a method by which to test the voluntariness of a statement made by an individual who had previously invoked the right to counsel and had then been released, the specter of a never-ending prohibition on questioning an individual, even by different authorities for a different offense and even years later, could not be avoided. *See, e.g., Minnick, supra,* 498 *U.S.* at 163, 111 *S.Ct.* at 496, 112 *L.Ed.*2d at 504 (Scalia, J., dissenting); *Gregory, supra,* 557 *S.E.*2d at 723. On the other hand, a few courts raised concerns that merely

releasing an individual from custody could not be sufficient, lest the police intentionally release a suspect briefly with the intention of resuming custody, repeating that process as an alternate way to wear the suspect down in violation of his or her constitutional rights. For those courts, the so-called "catch and release" strategy was a significant consideration. *See, e.g., Bautista, supra,* 145 *F.*3d at 1150 (opining that "[t]his is not to say that the police can circumvent *Edwards* by temporarily releasing a suspect for a short period of time and then reacquiring him"); *Storm, supra,* 124 *Cal.Rptr.*2d 110, 52 *P.*3d at 63.

Although this Court did not have the opportunity to consider the *Edwards* rule or the *McNeil* exception prior to the time when defendant in this matter was questioned, our Appellate Division in this case was persuaded by the reasoning of the federal and state courts that had found a break in custody to be sufficient to "dissolve an *Edwards* . . . claim." *Wessells, supra,* 408 *N.J.Super.* at 197, 974 *A.*2d 427 (quoting *Storm, supra,* 124 *Cal.Rptr.*2d 110, 52 *P.*3d at 62). Applying that analysis, our Appellate Division found the nine-day break in this case sufficient. *Ibid.*

## B.

During the time when this matter was pending before this Court, the United States Supreme Court spoke directly to the implications of a break in custody, *see Shatzer, supra,* —— *U.S.* ——, 130 *S.Ct.* 1213, 175 *L.Ed.*2d 1045, effectively transforming the question to be decided by this Court. Rather than requiring us to directly opine on the *Edwards* rule or the *McNeil* exception, the dispute between the parties requires that we first analyze the holding and reasoning that the United States Supreme Court expressed in the intervening decision in *Shatzer* and that we then address the parties' differing views about its retroactive implications.

In *Shatzer,* the United States Supreme Court explicitly recognized the break-in-custody exception to *Edwards,* refusing to extend the rationale of *Edwards* further than its holding would

otherwise warrant. *Id.* at ——, 130 *S.Ct.* at 1222, 175 *L.Ed.*2d at 1056. The Court reasoned that the *Edwards* presumption of involuntariness of statements made during renewed questioning of a suspect who had invoked the right to counsel would not apply to a suspect who had been released from custody for a period of time. *Id.* at ——, 130 *S.Ct.* at 1222, 175 *L.Ed.*2d at 1055–56. The Court identified considerations relevant to a suspect released from custody, including the fact that such an individual is not isolated, is likely to be in contact with counsel, family or friends, has already learned that a demand for counsel will cause interrogation to end, and knows that "investigative custody does not last indefinitely." *Id.* at ——, 130 *S.Ct.* at 1221, 175 *L.Ed.*2d at 1055.

Utilizing those factors, the Court concluded that such a suspect who waives his rights during renewed interrogation cannot be presumed to have been coerced, but is more likely to have concluded that cooperating with the authorities is in his or her interest, based on interactions with others during the period of time out of custody. *Ibid.* Explicitly rejecting an analysis of *Edwards* that would result in the "disastrous" consequence of an endless presumption of involuntariness, *id.* at ——, 130 *S.Ct.* at 1222, 175 *L.Ed.*2d at 1056, the Court adopted the approach taken "uniformly" in the federal and state courts recognizing that a break in custody could suffice to end the presumption. *Id.* at ——, 130. *S.Ct.* at 1220, 175 *L.Ed.*2d at 1053.

Having so concluded, the Court chose a practical approach, electing to fix the time needed for a break in custody that would serve to protect the rights of suspects as well as the needs of law enforcement personnel. For this purpose, the Court made its holding clear: "[i]t seems to us that period is 14 days. That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." [3] *Id.* at ——,

---

[3] The announcement in *Shatzer* that fourteen days would serve as the bright line between renewed questioning that is permitted and that which is prohibited

130 *S.Ct.* at 1223, 175 *L.Ed.*2d at 1057. Although recognition of the break-in-custody exception to the *Edwards* rule was in accord with all of the courts that had considered the issue, the fourteen-day period that the Court chose was something of a middle ground. The Court described it as a judicially prescribed prophylaxis, not a constitutional mandate, resting not on precedent but on the view that law enforcement officers "need to know, with certainty and beforehand, when renewed interrogation is lawful." *Id.* at ——, 130 *S.Ct.* at 1222–23, 175 *L.Ed.*2d at 1056.

The parties before this Court disagree about the meaning of *Shatzer*, debating whether it is truly a bright-line rule or instead represents a shift in presumptions to be applied regardless of the length of time involved in the break in custody. Although there are strong arguments on both sides of the question, our reading of the Supreme Court's opinion in *Shatzer* leads us to conclude that the Court meant to create a single rule such that a break in custody shorter than fourteen days is insufficient.

We reach this conclusion for several reasons. First, the Court referred to the *Edwards* rule, albeit obliquely, as a "conclusive" presumption, *see Shatzer, supra,* —— *U.S.* at ——, 130 *S.Ct.* at 1221, 175 *L.Ed.*2d at 1055 (reasoning by analogy to conclusive presumption of *Coleman v. Thompson,* 501 *U.S.* 722, 737, 111 *S.Ct.* 2546, 2558, 115 *L.Ed.*2d 640, 660 (1991)), suggesting that *Shatzer* should be similarly viewed.

---

did not end the dispute before that Court. Indeed, much of the Court's decision focuses on the implication, for purposes of the break-in-custody analysis, of an inmate's release from prison-based interrogation and return to the general prison population. *Shatzer, supra,* —— *U.S.* at ——, 130 *S.Ct.* at 1224–25, 175 *L.Ed.*2d at 1057–59. Perhaps because of that focus, the Court did not consider questions that might arise if an individual not otherwise in a custodial setting invokes his right to counsel during questioning here in New Jersey and shortly after his release is apprehended for a newly-committed, entirely different crime in another State, where the investigating authorities will have no ability "to know, with certainty, and beforehand," *id.* at ——, 130 *S.Ct.* at 1222–23, 175 *L.Ed.*2d at 1056, whether questioning is barred by strict application of the *Shatzer* rule.

Second, in explaining the reason for selecting fourteen days, the Court considered other time periods, including longer ones spanning a year or two, and a shorter one involving only a week, and concluded that it would be "impractical to leave the answer [about the sufficiency of the break] for clarification in future case-by-case adjudication." *Id.* at ——, 130 *S.Ct.* at 1222–23, 175 *L.Ed.*2d at 1056. The Court's rejection of a totality of the circumstances approach in favor of a single time period and its consideration of a shorter time frame suggests that shorter times were found inadequate.

Third, in further explaining the reason for the decision to fix a time, the Court addressed the concern about the catch and release technique, commenting "that there will now be nothing to gain from such gamesmanship." *Id.* at ——, 130 *S.Ct.* at 1223, 175 *L.Ed.*2d at 1057. Both by announcing a desire to avoid "gamesmanship" and by commenting that its goal was that "the court [will be] spared the fact-intensive inquiry," *id.* at ——, 130 *S.Ct.* at 1224, 175 *L.Ed.*2d at 1057, the Court made clear its intention about the rule's operation.

Finally, we are not persuaded by the State's contention that the *Shatzer* decision merely served to alter the presumptions that would apply to the voluntariness inquiry. Were we to adopt that approach, we would leave undisturbed the usual totality of the circumstances inquiry regardless of how much or how little time had passed since defendant was released from custody. There would be little point, we think, to the fourteen-day rule that the United States Supreme Court created, and little to be achieved in terms of clarity for law enforcement or for judicial economy, were we to read *Shatzer* as merely altering the ordinary presumptions that heretofore have informed the voluntariness analysis.

By electing to use language of certainty, the Court signaled its intention to avoid debate. If we concluded that a break in custody of fewer than fourteen days might nonetheless be sufficient to purge the taint of the earlier coercive effect, we would be reading *Shatzer* to have left open to endless debate, and to divergent

results, all breaks in custody of lesser duration. We can only conclude that by announcing a single, prophylactic rule, the Court meant to forestall such debate and to replace the uncertainty that it would create with the certainty that flows from a clear rule of application. Although it is possible that some individuals who are released for fewer than fourteen days might, if approached by law enforcement, in fact thereafter voluntarily elect to waive their rights free of taint, the clear implication of the Court's ruling is to utilize this single, easy to apply rule so as to eliminate all doubt.

## C.

█ We turn then to the question of whether defendant is entitled to claim the benefit of the *Shatzer* decision, a matter that requires us to consider well-settled federal principles [4] of retroactivity. We need not trace at length the development of retroactivity jurisprudence in the federal courts, but begin with the observation that the United States Constitution does not address whether any decision of the United States Supreme Court shall be given retroactive or prospective effect. *Brown v. Louisiana,* 447 *U.S.* 323, 327, 100 *S.Ct.* 2214, 2219, 65 *L.Ed.*2d 159, 165 (1980) (noting that the Constitution "neither prohibits nor requires retrospective effect").

█ Instead, federal retroactivity turns on whether a new rule of law has been announced, coupled with an analysis of the status of the particular matter, that is, whether it is not yet final, is pending on direct appeal, or is being collaterally reviewed. *See Whorton v. Bockting,* 549 *U.S.* 406, 416, 127 *S.Ct.* 1173, 1180–81, 167 *L.Ed.*2d 1, 10–11 (2007). Although the law governing whether

---

[4] Our state law retroactivity principles, which are similar but not identical, *see State v. Dock,* 205 *N.J.* 237, 254, 15 *A.*3d 1 (2011) (describing New Jersey's three-part retroactivity analysis), are not directly implicated in this appeal, *see Harper v. Va. Dep't of Taxation,* 509 *U.S.* 86, 100, 113 *S.Ct.* 2510, 2519, 125 *L.Ed.*2d 74, 88 (1993) (holding that "[t]he Supremacy Clause does not allow federal retroactivity doctrine to be supplanted by the invocation of a contrary approach to retroactivity under state law").

to apply new rules retroactively has evolved over time, it is now well-established that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Griffith v. Kentucky*, 479 *U.S.* 314, 328, 107 *S.Ct.* 708, 716, 93 *L.Ed.*2d 649, 661 (1987); *see State v. Harvey*, 121 *N.J.* 407, 422–23, 581 *A.*2d 483 (1990) (acknowledging that retroactivity issues in "criminal-procedure decisions implicating rights guaranteed under the federal constitution" are governed by *Griffith* retroactivity analysis).

The parties dispute whether *Shatzer* represents a new rule of law as defined by these precedents. The State asserts that the Court in *Shatzer* did not announce a rule of constitutional dimension, but merely devised a prophylactic measure designed to create certainty for the future, and that by using the word "[n]ow" to announce it, *Shatzer, supra,* ⸺ *U.S.* at ⸺, 130 *S.Ct.* at 1223, 175 *L.Ed.*2d at 1057, the Court signaled its intention that it be given only prospective effect.

Defendant asserts that the *Shatzer* opinion is entitled to retroactive effect of at least sufficient scope to apply it to his circumstances. Relying on the analysis that the United States Supreme Court undertook in determining the retroactive implications of *Edwards* itself, *see Shea v. Louisiana*, 470 *U.S.* 51, 59, 105 *S.Ct.* 1065, 1070, 84 *L.Ed.*2d 38, 47 (1985), defendant asserts that because he has not yet been tried for the crimes with which he was charged, he would benefit under any standard of retroactivity.

Regardless of the fine points of how the retroactivity analysis might apply to others, we agree with defendant that he is entitled to the benefit of the rule announced in *Shatzer* because he has not yet been tried. Although, as the State points out, the United States Supreme Court used the word "now" in announcing its decision, we are not persuaded that the Court, by selecting that single word, intended to limit the decision to a prospective application or to deprive defendants not yet tried of its benefit.

## D.

The United States Supreme Court in *Shatzer* created a simple rule that it intended to serve both the purpose of alerting the police to the time frame that defendants must be afforded following the invocation of the right to counsel and the time span of the release from custody required to ensure that a confession given during renewed interrogation will not violate that previously-asserted right. Utilizing the ordinary federal retroactivity analysis, we conclude that defendant is entitled to the benefit of the *Shatzer* rule, inasmuch as he has not yet been tried for the crimes with which he has been charged.

We therefore apply the rule devised in *Shatzer* to the matter before us in light of the clear record that has been presented. Defendant was first questioned about the triple homicide on September 3 following his arrest on an unrelated traffic warrant. At that time he made a variety of statements to the police relating to his relationship with one of the victims and concerning the assault upon him in August. As the trial court found, however, that interview ended when he invoked his right to counsel and he was then released from custody. Because the trial court's finding that he invoked his right to counsel is based on the court's evaluation of the testimony of the witnesses, including the interrogating officers and defendant, and is supported by substantial credible evidence in the record, it is entitled to our deference. *State v. Locurto,* 157 *N.J.* 463, 470–71, 724 *A.*2d 234 (1999). It was nine days later when defendant was again arrested, by the same investigating authorities, who questioned him further about the murders. Although he was again advised of his *Miranda* rights, the clear rule of *Shatzer* demands that we conclude that the coercive taint of the initial interrogation had not dissipated and that his statements on September 12 were therefore not voluntary.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—7.

*Opposed*—None.