NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0793-13T1

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

DONNA JONES,

    Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

July 29, 2014

APPELLATE DIVISION

Submitted April 1, 2014 — Decided July 29, 2014

Before Judges Fisher, Espinosa and Koblitz.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 12-06-1643.

Warren W. Faulk, Camden County Prosecutor, attorney for appellant (Linda A. Shashoua, Assistant Prosecutor, of counsel and on the brief).

Law Offices of Michael W. Kahn, P.C., and Brenner Brenner & Spiller, attorneys for respondent (Michael W. Kahn and Fletcher C. Duddy, on the brief).

    The opinion of the court was delivered by

ESPINOSA, J.A.D.

    In Missouri v. McNeely, ___ U.S. ___, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), a warrantless blood test was administered to a driver arrested for driving while intoxicated after a

routine traffic stop. There being no other facts to suggest an emergency existed, the United States Supreme Court was asked to decide the broad question "whether the natural metabolization of alcohol in the bloodstream presents a _per se exigency_ that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing _in all drunk-driving cases_." _Id._ at ___, 133 _S. Ct._ at 1556, 185 _L. Ed._ 2d at 702 (emphasis added). Concluding that fact alone did not present a "_per se_ exigency," the Supreme Court held, "consistent with general Fourth Amendment principles, that exigency in this context must be determined case by case based on the totality of the circumstances." _Ibid._

Prior to the Supreme Court's decision, defendant caused a multiple vehicle accident, resulting in personal injury to herself and another that required each of them to be transported to a hospital. It took emergency personnel approximately thirty minutes to extricate the unconscious defendant from her vehicle. The police investigation of the accident scene at a heavily traveled intersection took several hours. Relying on _McNeely_, the trial court suppressed a blood alcohol content (BAC) reading of .345, the result of a blood test administered without a warrant. We granted leave to the State to appeal from this order and, for the reasons that follow, we reverse.

Defendant was indicted on one count of fourth-degree assault by auto, N.J.S.A. 2C:12-1(c)(2), and was issued related summonses for reckless driving, N.J.S.A. 39:4-96, and driving while intoxicated, N.J.S.A. 39:4-50. She filed a motion to suppress the results of the blood sample.

Two witnesses testified at the suppression hearing, Officers James Watts and Anthony Sorrentino of the Cherry Hill Police Department. The facts elicited at the suppression hearing can be summarized as follows:

It was dusk at approximately 7:00 p.m. on December 28, 2011, when a three-vehicle crash occurred at the intersection of Kings Highway, a State highway, and Church Road, a county road in Cherry Hill. Traffic at this location is heavy during rush hour conditions. Two automobiles were stopped at a red light on Kings Highway. Defendant drove her vehicle into the second car stopped at the light, propelling it into the automobile ahead of it. Defendant's vehicle continued to strike the second vehicle before "careening off" across the intersection, where it wedged up against a cemetery archway. Because the accident involved injuries, it was a "Code 2" crash in which available police units are dispatched to the scene. In addition to the eleven officers who responded, there were at least two Emergency

Medical Service (EMS) vehicles and four EMS personnel, two fire trucks and an unknown number of firefighters at the accident scene.

Officer Sorrentino was one of the first officers on the scene, which he described as "very chaotic." Officers Watts and Sorrentino described the officers' tasks at the scene. Officer Sorrentino stated,

> [W]hen we first responded we had to set up traffic directions so we had to block off the vehicles that were damaged. And we had to set up a system for directing traffic around the damaged vehicles as well as the emergency vehicles. Someone had to attend to the victims in each car and other units would have attended to any witnesses or tried to locate any witnesses at the scene.

Several officers were needed to assess the traffic conditions, the occupants of the three vehicles, and the situation involving defendant's car. There was a concern that the building defendant had struck might collapse. Watts described the officers' objective as "to make sure . . . that there's nothing else going to happen to make the scene worse."

Defendant was found inside her vehicle, unconscious and bleeding from her face. The fire department and Emergency Medical Technicians (EMTs) had to extricate her from her heavily damaged car, a process that took approximately one-half hour. As defendant was being removed from the vehicle and placed in

4

the ambulance, the EMTs told Officer Sorrentino that there was an odor of alcohol on defendant's breath. Because defendant remained unconscious, no sobriety tests were administered at the scene. Defendant was taken to the hospital along with an occupant of one of the other cars who was also injured in the accident.

Officer Watts, a traffic safety officer, testified that his assignment is to investigate what are deemed to be potentially serious or fatal accidents. He was called to investigate the scene approximately forty-five minutes to one hour after the accident was reported, arriving after defendant had been taken to the hospital. He testified it took several hours for the investigation at the scene to be completed.

Officer Sorrentino went to the hospital to follow up on the injuries of defendant and the occupant of the other vehicle, which proved not to be serious. Once defendant regained consciousness, Officer Sorrentino asked her if she had anything to drink and she responded that she had at least one beverage. The record does not reveal for how long defendant was unconscious. Officer Sorrentino described defendant's speech as "very slurred." She was unable to answer his questions when he asked for her address or for a phone contact for a relative.

At Officer Sorrentino's request, a nurse drew defendant's blood at approximately 8:15 p.m. The blood test revealed a BAC reading of .345.[1] Thus, the blood was drawn approximately one hour and fifteen minutes after police responded to the automobile accident.

Officer Sorrentino testified that, pursuant to standard operating procedures at the time, he was not required to obtain a search warrant. He testified further that he did not receive his first training in securing telephone warrants until after the accident. Both Watts and Sorrentino testified that, to their knowledge, telephone warrants were not available in their jurisdiction in December 2011.[2] As of the time of the suppression hearing, neither had obtained a telephone warrant.

The suppression hearing in this case was conducted approximately four months after McNeely was decided. Citing our Supreme Court's decision in State v. Wessells, 209 N.J. 395, 411-12 (2012), the motion judge observed that McNeely applied to all cases that were not yet final because the decision

---

[1] The penalties for driving while intoxicated apply to persons who operate a motor vehicle with a BAC of 0.08% or higher. N.J.S.A. 39:4-50. Defendant's BAC was more than four times this amount.

[2] On cross-examination, Watts stated he was referring to his own understanding that a telephone warrant was not needed "for blood samples at a crash scene."

A-0793-13T1

implicated rights guaranteed under the federal Constitution. The motion judge described the applicable rule as requiring a warrant for a blood sample unless an exception to the warrant requirement, such as an exigency, applies. He stated,

> [T]he rule in both McNeely and Schmerber [v. California, 384 U.S. 757, 771-72, 86 S. Ct. 1826, 1836, 16 L. Ed. 2d 908, 920 (1966)] is that a warrantless blood draw may be taken from drunk driving suspects based on the exigency of the dissipation of blood alcohol evidence where the totality of the circumstances indicates that the officer did not have time to obtain a warrant. The Court in Schmerber found an exigency to exist while the Court in McNeely affirmed the Missouri Supreme Court decision finding none.

The motion judge found both Sorrentino and the other police witness to be "genuinely credible," and "acted probably in good faith," which included "ask[ing] the hospital personnel to use a kit to do a blood draw of the suspect" instead of seeking a search warrant. He also recognized that while telephonic warrants were available, it was not the general practice to use them.

The motion judge found that the officers had a sufficient legal basis to seek a search warrant when the EMT alerted them to the odor of alcohol on defendant in light of the circumstances of the accident. The judge acknowledged eleven police officers were required in addition to the emergency

personnel at the accident scene and that the officers had "duties to attend to of great importance at the scene and were attending to them." However, the motion judge concluded that the State had not established that

> under all the circumstances of this case, this three-car accident with one serious injury and one minor injury, was such that all the attention of all the police officers the entire time they were all there was required to attend to duties at the scene such that <u>it would have been impossible for any one of them to have had the time to call for a search warrant telephonically.</u>
>
> [Emphasis added.]

The motion judge also stated that, although <u>McNeely</u> and the caselaw generally discuss the natural metabolization of alcohol in the bloodstream, he had no evidence before him that showed

> in any kind of detail as to precisely what that problem is, precisely how quickly alcohol tends to metabolize, what the time frame is within which the alcohol test must have been conducted relative to the last time the person ingested alcohol for some sort of reasonably fair reading to be obtained.

Accordingly, defendant's motion to suppress was granted.

In this appeal, the State argues that the motion judge erred in applying <u>McNeely</u> "retroactively" and in failing to find an exigency in the circumstances here. Defendant does not dispute that the procedure here would have passed muster under the applicable New Jersey precedents. Instead, she contends

that New Jersey precedent constituted "bad law," premised upon a misreading of Schmerber. She submits that the motion judge was correct in applying McNeely to this case and in concluding there was no exigency to excuse the failure to obtain a warrant.

In reviewing the denial of a motion to suppress, this court "must uphold the factual findings underlying the trial court's decision so long as" there is sufficient and credible support in the record. State v. Elders, 192 N.J. 224, 243 (2007). The trial court's legal conclusions, however, are not entitled to the same deference — "appellate review of legal determinations is plenary." State v. Handy, 206 N.J. 39, 45 (2011).

In this case, the motion judge concluded that the blood test results had to be suppressed because the State failed to show "it would have been impossible" to obtain a warrant. In addition, he criticized the lack of precise information regarding the elimination rate for defendant's BAC and questioned the allocation of police resources at the scene of the accident. We conclude that the judge erred in his application of the standard required by McNeely and Schmerber and that the blood test results should not have been suppressed.

II

In 2011, New Jersey law permitted the police to obtain a blood sample without first obtaining a warrant, so long as they

had probable cause to believe that the driver was intoxicated and the sample was taken "in a medically acceptable manner at a hospital or other suitable health care facility," State v. Dyal, 97 N.J. 229, 238 (1984) (citing Schmerber, supra, 384 U.S. at 771-72, 86 S. Ct. at 1836, 16 L. Ed. 2d at 920), and without the use of excessive force.  State v. Ravotto, 169 N.J. 227, 231-33 (2001); see also State v. Adkins, 433 N.J. Super. 479, 482-84 (App. Div. 2013), certif. granted, 217 N.J. 588 (2014).

The following passage in Schmerber provided guidance for our decisions:

> [T]he questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness.
>
> In this case, as will often be true when charges of driving under the influence of alcohol are pressed, these questions arise in the context of an arrest made by an officer without a warrant.  Here, there was plainly probable cause for the officer to arrest petitioner and charge him with driving an automobile while under the influence of intoxicating liquor.  The police officer who arrived at the scene shortly after the accident smelled liquor on petitioner's breath, and testified that petitioner's eyes were "bloodshot, watery, sort of a glassy appearance."  The officer saw petitioner again at the hospital, within two hours of the accident. . . .
>
> . . . .

Although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol, the question remains whether the arresting officer was permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test. Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned. . . .

The officer in the present case, however, <u>might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened "the destruction of evidence[.]"</u> We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. <u>Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant</u>. Given <u>these special facts</u>, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

[<u>Schmerber</u>, <u>supra</u>, 384 <u>U.S.</u> at 768-771, 86 <u>S. Ct.</u> at 1834-36, 16 <u>L. Ed.</u> 2d at 918-20 (emphasis added) (internal citations omitted).]

In <u>Dyal</u>, <u>supra</u>, our Supreme Court described the "crucial consideration" in this reasoning:

[T]he body eliminates alcohol at a rapid rate. The evidence is evanescent and may

> disappear in a few hours. Investigating police, while coping with an emergency, should not be obliged to obtain a search warrant before seeking an involuntary blood test of a suspected drunken driver.
>
> [97 N.J. at 239-40 (citing Schmerber, 384 U.S. at 770-71, 86 S. Ct. at 1836, 16 L. Ed. 2d at 919-20).]

Our courts did not stand alone in this interpretation of Schmerber. The Supreme Court noted that it was deciding McNeely to resolve a split in federal authority on this issue. Id. at ___, 133 S. Ct. at 1558, 185 L. Ed. 2d at 703; see also 3 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment, §5.4(b) (5th ed. 2012) and cases cited therein.

It is an ineluctable conclusion that, at the time Officer Sorrentino requested a blood sample, he had probable cause to believe that defendant had been driving while intoxicated. The parties stipulated that the blood sample was obtained in a medically acceptable manner. It would therefore appear that the blood sample procedure here complied with New Jersey law at the time of the accident and defendant has not argued to the contrary.

We note further that, if the ruling in McNeely had come from our Supreme Court based upon the protections afforded by the New Jersey Constitution, the ruling would have marked a clear departure from New Jersey precedent that would have been

limited to prospective application.  See State v. Cummings, 184 N.J. 84, 96-99 (2005); see also Adkins, supra, 433 N.J. Super. at 486.

III

Since McNeely is rooted in the Supreme Court's interpretation of federal constitutional law, its application here is governed by the well-established principle that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." Wessells, supra, 209 N.J. at 412 (quoting Griffith v. Kentucky, 479 U.S. 314, 328, 107 S. Ct. 708, 716, 93 L. Ed. 2d 649, 661 (1987)).  Citing Wessells, defendant argues and the motion judge found that McNeely must be given "retroactive" application,[3] a

---

[3]  In Wessells, our Supreme Court addressed the question whether a defendant's statement to police following his arrest should be suppressed because the questioning violated a new bright-line rule subsequently announced by the United States Supreme Court in Maryland v. Shatzer, 559 U.S. 98, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010).  Wessells, supra, 209 N.J. at 397.  In that case, the United States Supreme Court established fourteen days as "a break in custody that is of sufficient duration to dissipate its coercive effects" for renewed interrogation of a suspect who initially requested counsel.  Shatzer, supra, 559 U.S. at 109, 130 S. Ct. at 1222, 175 L. Ed. 2d at 1056.  After reviewing the history of pertinent precedent, the Court observed that Shatzer represented a "rejection of a totality of the circumstances approach in favor of a single time period," and
(continued)

conclusion rejected by another part of this court.[4] For the purposes of our analysis here, however, we need not determine whether <u>McNeely</u> should be applied retroactively because we conclude that the application of <u>McNeely</u> to the facts of this case does not require the suppression of the results of defendant's blood test.

The fact that the Supreme Court rejected a <u>per se</u> exigency rule in <u>McNeely</u> should not be misinterpreted as a retreat from its recognition that the dissipation of alcohol in the blood merits considerable weight in a totality of the circumstances analysis. It must be emphasized that both the Missouri Supreme

---

(continued)
that the United States Supreme Court's "language of certainty" was intended to "avoid debate" by creating a bright line rule. <u>Wessells</u> <u>supra</u>, 209 <u>N.J.</u> at 410. In contrast to <u>Shatzer</u>, <u>McNeely</u> did not establish a bright line rule but rather, adhered to a totality of the circumstances approach to the resolution of challenges to warrantless blood samples taken from suspected drunk drivers. <u>See</u> <u>McNeely</u>, <u>supra</u>, ___ <u>U.S.</u> at _____, _____, 133 <u>S. Ct.</u> at 1559, 1563-64, 185 <u>L. Ed.</u> 2d at 705, 709-10.

[4] In <u>Adkins</u>, we observed that "the United States Supreme Court will not apply the exclusionary rule as a remedy where the police conducted a search in good faith reliance on binding legal precedent in the jurisdiction where the search occurred," and that the Court had clarified that retroactive application is not mandated by a new rule of substantive Fourth Amendment law. <u>Id.</u> at 484-85 ("[T]he retroactive application of a new rule of substantive Fourth Amendment law <u>raises</u> the question whether a suppression remedy applies; it does not answer that question.") (quoting <u>Davis v. United States</u>, ___ <u>U.S.</u> ___, ___, 131 <u>S. Ct.</u> 2419, 2431, 180 <u>L.Ed.</u> 2d 285, 298-99 (2011)).

A-0793-13T1

Court and the United States Supreme Court described the facts in McNeely as "'unquestionably a routine DWI case' in which no factors other than the natural dissipation of blood-alcohol suggested that there was an emergency." McNeely, supra, ___ U.S. at ___, 133 S. Ct. at 1557, 185 L. Ed. 2d at 703 (quoting State v. McNeely, 358 S.W.3d 65, 74 (Mo. 2012)). There was no accident; no injured defendant who needed to be extricated from her heavily damaged car; no other injured person who had to be transported to the hospital; no concentration of disabled cars and emergency vehicles at a busy intersection; and no police investigation beyond the DWI arrest.

Still, the Supreme Court accepted as "true" the immutable fact that the alcohol level in one's bloodstream begins to dissipate from the time "the alcohol is fully absorbed and continues to decline until the alcohol is eliminated." Id. at ___, 133 S. Ct. at 1560, 185 L. Ed. 2d at 706. It is through this lens that the Supreme Court assessed the totality of the circumstances.

The Supreme Court discounted the significance of the "exact elimination rate," finding it "sufficient" to note that "because an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results." Id. at ___, 133 S.

Ct. at 1560-61, 185 L. Ed. 2d at 707 (emphasis added).[5] The Court emphasized this point, stating,

> This fact was essential to our holding in Schmerber, as we recognized that, under the circumstances, further delay in order to secure a warrant after the time spent investigating the scene of the accident and transporting the injured suspect to the hospital to receive treatment would have threatened the destruction of evidence.
>
> [Id. at ____, 133 S. Ct. at 1561, 185 L. Ed. 2d at 707 (emphasis added).]

The salient points to be made here are that the dissipation of blood alcohol continues to be an "essential" factor in analyzing the totality of the circumstances; that time spent investigating an accident and transporting an injured suspect to the hospital causes delay; that obtaining a warrant will result in further delay;[6] and that such additional delay will "threaten"

---

[5] The Court observed, "More precise calculations of the rate at which alcohol dissipates depend on various individual characteristics (such as weight, gender, and alcohol tolerance) and the circumstances in which the alcohol was consumed." Id. at ____, 133 S. Ct. at 1560, 185 L. Ed. 2d at 707 (citing Stripp, Forensic and Clinical Issues in Alcohol Analysis, in Forensic Chemistry Handbook 437-41 (L. Kobilinsky ed. 2012)). Since many of these facts, as well as the time a suspect ceased drinking alcohol, are unlikely to be known to officers arriving at an accident scene, the Court's dismissal of any need to prove an "exact elimination rate" is a practical approach to the analysis.

[6] Recognizing that some delay is inevitable, even in a telephone warrant situation, the Court stated, "We by no means claim that telecommunications innovations have, will, or should eliminate

(continued)

the destruction of evidence. The Supreme Court did not require the State to show that the "further delay" would substantially impair the probative value of a blood sample drawn after a warrant was obtained or that it was impossible to obtain a warrant before the evidence was dissipated. In short, the Court did not require proof that evidence would be destroyed; it was sufficient to show that delays "threatened" its destruction.

It is therefore clear that the motion judge applied a more stringent test than that required by McNeely. The judge interpreted McNeely to mean that an exigency is limited to circumstances where there is no time to obtain a warrant. This very standard was advocated by Chief Justice Roberts in his partial dissent. He would have established the following rule:

> If there is time to secure a warrant before blood can be drawn, the police must seek one. If an officer could reasonably conclude that there is not sufficient time to seek and receive a warrant, or he applies for one but does not receive a response before blood can be drawn, a warrantless blood draw may ensue.
>
> [McNeely, supra, ____ U.S. at _____, 133 S. Ct. at 1573, 185 L. Ed. 2d at 752 (Roberts, C.J., concurring and dissenting).]

---

(continued)
all delay from the warrant-application process." Id. at ___, 133 S. Ct. at 1562, 185 L. Ed. 2d at 709.

A-0793-13T1

The Supreme Court explicitly declined to adopt the Chief Justice's "modified _per se_ rule," favoring instead the "traditional totality of the circumstances analysis." _Id._ at ____, 133 _S. Ct._ at 1563, 185 _L. Ed._ 2d at 710. Of particular importance to an analysis of the facts here, _McNeely_ described the special facts considered in the _Schmerber_ Court's analysis which, the Court agreed, were sufficient to support a warrantless blood test:

> [T]he petitioner had suffered injuries in an automobile accident and was taken to the hospital. While he was there receiving treatment, a police officer arrested the petitioner for driving while under the influence of alcohol and ordered a blood test over his objection. . . . [W]e concluded that the warrantless blood test "in the present case" was nonetheless permissible because the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'"
>
> In support of that conclusion, we observed that evidence could have been lost because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." We added that "[p]articularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." "Given these special facts," we found that it was appropriate for the police to act without a warrant.

> [McNeely, supra, ___ U.S. at ____, 133 S. Ct.
> at 1559-60, 185 L. Ed. 2d at 705-06 (emphasis
> added) (internal citations omitted).]

The Court described the analysis in Schmerber as "fit[ting] comfortably within our case law applying the exigent circumstances exception." Id. at ____, 133 S. Ct. at 1560, 185 L. Ed. 2d at 706. Notably, the Court did not dissect precisely how much time was used to take the accused to the hospital or required to investigate the scene of the accident, and it did not evaluate in hindsight whether the officers on the scene allocated their resources efficiently.

In sum, the "special facts" that supported a warrantless blood sample in Schmerber and were absent in McNeely, were present in this case: an accident, injuries requiring hospitalization, and an hours-long police investigation. Therefore, it was not necessary for the officers to shoulder the further delay entailed in securing a warrant that would have threatened the destruction of the blood alcohol evidence. Defendant's suppression motion should have been denied.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0793-13T1