**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2182-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LAURIE WINT a/k/a LAURIE A.
WINT, JR., LAURIE
AINSWORTH WINT, LANCE,

    Defendant-Appellant.

_____

Argued May 30, 2017 — Decided June 20, 2017

Before Judges Sabatino, Nugent and Geiger.

On appeal from Superior Court of New Jersey,
Law Division, Camden County, Indictment No.
12-09-2523.

Marcia Blum, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E.
Krakora, Public Defender, attorney; Ms. Blum,
of counsel and on the brief).

Sarah Lichter, Deputy Attorney General, argued
the cause for respondent (Christopher S.
Porrino, Attorney General, attorney; Sara M.
Quigley, Deputy Attorney General, of counsel
and on the brief).

PER CURIAM

Following a 2014 jury trial, defendant Laurie Wint[1] was convicted of second-degree passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2) as a lesser-included offense of murder (count one); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count three); fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a) (count four); and a second-degree "certain persons" weapons offense, N.J.S.A. 2C:39-7(b) (count five). After appropriate mergers, the trial court sentenced defendant to a fourteen-year custodial term on count one, subject to an eighty-five percent parole ineligibility period pursuant to N.J.S.A. 2C:43-7.2, a four-year concurrent flat sentence on count four, and an eight-year consecutive term on count five, subject to a five-year parole disqualifier. These sentences were all made consecutive to a sentence that defendant was serving on a Pennsylvania conviction.

A key aspect of the State's proofs at trial was defendant's admission, made during the course of a custodial interrogation by detectives in Pennsylvania who were investigating a different homicide in that state, that he had "murdered" a victim in New

_____

[1] In certain portions of the record, defendant is referred to as "Lance."

Jersey in June 2011. The interview in Pennsylvania took place about six months after defendant had been met successively in New Jersey by Camden and then by Pennsylvania detectives, and after he had invoked each time his rights to counsel and to remain silent. The trial court denied defendant's motion to suppress his incriminating statement to the Pennsylvania investigators after conducting a pretrial hearing on the issue.

Defendant's principal argument on appeal is that the trial court erred in its suppression ruling by misapplying the principles of Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), and other case law that substantially restricts the re-interrogation of suspects who have invoked their privilege against self-incrimination and their rights to have counsel present. Defendant further argues that the prosecutor made unduly prejudicial comments during summation. Lastly, he contends that the trial court should have granted his motion for a mistrial when it excused two jurors and replaced them with alternates.

For the reasons that follow, we remand the suppression issue for reconsideration and a taint/attenuation hearing. As we explain, the remand proceeding shall focus upon what we have determined to be the impropriety of the Pennsylvania detectives' first attempted interview of defendant in New Jersey, and whether that interview tainted their interview of defendant in

Pennsylvania six months later. We reject defendant's remaining arguments concerning the summation and the replacement of jurors.

## I.

The trial arose out of the fatal shooting of the victim, Kevin Miller, in a park in Camden on June 8, 2011. The State's theory was that defendant, who had previously dated Miller's girlfriend, had purposefully killed Miller after the two of them had an argument. Conversely, defendant claimed that he had fired the gun in self-defense after being accosted in the park by Miller and several other individuals, at least two of whom had gang affiliations.

The State presented no eyewitnesses at trial who actually observed the shooting. However, it did present testimony from a resident next to the park who heard the sound of a gunshot while he was outside of his home watering plants. According to that resident, when he heard the shot, he looked up and saw two men running in the same direction. One man appeared to be chasing the other man. The resident saw the man who was being chased collapse. Other young men ran up to the collapsed man, who told them that he had been shot. The injured man was then placed in a pickup truck and driven away. The resident did not get a "clear view" of the man who had been chasing the shooting victim.

The State also presented testimony from defendant's former girlfriend. She testified that on the day in question, which happened to be her birthday, she had gone to Philadelphia with defendant and two other friends to smoke marijuana. When she returned to Camden later in the day, she learned that Miller, her then-current boyfriend, had been angry with her. She tried to call Miller, but he did not answer. According to testimony from the girlfriend's mother, Miller had stopped by her house that afternoon to show her a ring he bought her as a birthday gift. When Miller learned she was not home, he immediately left.

A woman who was defendant's current girlfriend at the time of the shooting testified that she had encountered Miller that same day. He asked her, "Where's your boyfriend? I heard he was with my girlfriend." When Miller left her, she sent a text message to defendant that warned him he was "chillin' with the enemy."

The prosecution also called to the stand Clifton Bailey, a friend of Miller who had been with him on the day of the shooting. Bailey testified that Miller had picked him up at about 6:00 p.m. that day. Miller drove them to his girlfriend's house. Upon discovering she was not home, they drove around the neighborhood for a while looking for her. At that point, Bailey received a call from his girlfriend, who informed him that Miller's girlfriend had been in Philadelphia that day with defendant and other people.

5

According to Bailey, this revelation angered Miller. Bailey and Miller went to the park to "talk to one of our boys." Bailey denied that Miller was armed at the time.

As described by Bailey, he and Miller started going into the park, with Miller walking ahead of him. He saw Miller "tussling with somebody,"[2] and then heard a gunshot. Bailey then saw Miller running inside the park, with another unidentified person running nearby. Bailey saw Miller fall. Recognizing Miller was wounded, Bailey drove him to the hospital.

Miller died thereafter. The undisputed cause of death, as confirmed by the medical examiner, was a gunshot wound to the left side of his chest.

Another prosecution witness, a close friend of defendant, testified that he saw defendant three or four days after the shooting. According to that witness, defendant revealed that Miller and Bailey, along with others, had tried to "jump" him in the park, and that Miller had punched him in the face. Defendant admitted to the friend that he became scared and thought "somebody was reaching like they [were] going to pull out a gun or

---

[2] Bailey had told police during an interview before trial that the person who had been "tussling" with Miller was defendant. However, after conducting a hearing pursuant to State v. Gross, 121 N.J. 1, 17 (1990), the trial court excluded that prior statement by Bailey as being insufficiently reliable to present to the jury.

something." Defendant told his friend he then pulled out his gun and "just shot[.]"

Defendant was arrested by Camden County police officers over a month later, on July 31, 2011. The police located defendant after receiving a phone call reporting the whereabouts of a fugitive who was wanted for homicide. Defendant tried to run out of the house in which he was hiding once he saw that police officers were coming for him.

Two days before defendant was arrested in New Jersey, he and another person were charged in Pennsylvania with the unrelated murder of a different victim occurring in that state. On the day of defendant's arrest, two detectives from Pennsylvania were waiting for him in the Camden County Prosecutor's Office to question him about the Pennsylvania charges. The Pennsylvania detectives monitored defendant from an adjacent room as he was first questioned there by Camden police.

The Camden police issued Miranda[3] warnings to defendant, but he declined to waive his privilege against self-incrimination and he also invoked his right to have counsel present. The Camden police consequently suspended their questioning. They told

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

defendant that a "couple more people [would] just stop in for you. Okay?" Defendant did not respond.

Immediately afterwards, the two Pennsylvania detectives came into the interrogation room and attempted to interview defendant, after giving him <u>Miranda</u> warnings. Defendant declined to speak substantively with those detectives. However, he expressed at that time a willingness to speak with them with counsel present about the Pennsylvania homicide, but at a later time in Pennsylvania.[4] Shortly thereafter, the Pennsylvania detectives encountered defendant in the hallway, and he reiterated his willingness to speak with them on a future occasion in Pennsylvania.

Several months later, Pennsylvania detectives met defendant in the Camden County jail to obtain from him a DNA sample. According to the detectives' testimony, they did not question him at that meeting. However, they did advise him that they were processing paperwork to bring him to Pennsylvania for questioning, to which defendant responded, "Yeah, I'll talk to you when I get back to Bucks [County]."

---

[4] The details of this questioning, which were developed in a pretrial suppression hearing, are discussed in more detail in Part II(A), <u>infra</u>.

Six months after his initial questioning in Camden, defendant was brought from the Camden jail to a police station in Warminster, Pennsylvania to speak with the Pennsylvania detectives. No counsel for defendant was present. The Pennsylvania detectives re-administered Miranda warnings to defendant. He then waived his rights, and proceeded to speak with the detectives.

During the course of questioning defendant, Detective Martin McDonough of the Bucks County District Attorney's Office asked him why he had come to Warminster. Defendant responded, "[T]here were warrants for us. In June 2011 I committed a murder in Camden. About three weeks after the murder I saw my picture on TV."

At trial, the State called Detective McDonough to relate defendant's incriminating statement admitting that he had committed a murder in Camden. That critical evidence was presented to the jury, in accordance with the trial court's denial of defendant's pretrial suppression motion.

Defendant was the only witness to testify at trial on his behalf. He asserted that Miller and Bailey were members of the Bloods gang, but claimed that he himself was not a member of any gang. He described both Miller and Bailey as "violent[,]" asserting that they "always start[ed] trouble in the neighborhood."

A-2182-14T3

Defendant told the jury that on June 8, 2011 he was walking through the park on his way home, after returning from the trip to Philadelphia. Defendant testified that, while walking, he saw a white Crown Victoria containing Bailey, Miller, and two other men. According to defendant, the car "stopped in the middle of the street" and all four men got out. Miller then allegedly said, "Yo, Lance, come here, come here," but defendant asserted that he kept walking.

According to defendant, he then heard Miller "running across the street[,]" and when defendant looked back, "all three of them started punching" him. Defendant claimed that he then saw Bailey "pull out the gun[,]" at which point the men "start[ed] backing up and pulling out another gun[.]" In response, defendant "reached for [his] gun and shot it[,]" because he was "scared that [he] was going to die."

Defendant admitted that he did not have a permit for the .25 caliber gun he used. He insisted that he carried a gun, despite the lack of a permit, because he lived "in a violent neighborhood" and needed to "save" himself. Defendant testified that, when he shot the gun, he "just pulled the trigger." According to defendant, he did not know that the bullet had hit anyone. Defendant asserted that, as he ran from the scene, he threw the gun away.

Defendant further testified that he left Camden about three weeks later and went to Warminster, because "I saw myself on TV and they said I was wanted for murder." He claimed that he did not know that New Jersey had a self-defense law, so he "just took off." Defendant also testified that the Bloods gang members were "looking" for him and "were trying to shoot" him.

According to defendant, he told Detective McDonough during the interview in Warminster that he "did a <u>shooting</u> in Camden." McDonough allegedly then asked if someone had died, and when defendant responded that they had, McDonough told him, "that's a murder."

## II.

In his brief on appeal, defendant presents the following arguments:

POINT I

THE PURPORTED CONFESSION, ELICITED DURING AN INTERROGATION CONDUCTED AFTER WINT HAD ASSERTED HIS RIGHT TO COUNSEL AT TWO PREVIOUS INTERROGATIONS, SHOULD HAVE BEEN SUPPRESSED UNDER THE <u>EDWARDS</u> RULE BECAUSE: WINT DID NOT INITIATE COMMUNICATION WITH THE POLICE AFTER HE FIRST ASSERTED HIS RIGHT TO COUNSEL; THERE WAS NO BREAK IN CUSTODY BETWEEN HIS TWO PRIOR ASSERTIONS OF THE RIGHT TO COUNSEL AND THE THIRD INTERROGATION; AND HE WAS NOT PROVIDED WITH COUNSEL AT THE THIRD INTERROGATION.

A. The <u>Edwards</u> rule.

B. The purported statement should have been suppressed because Wint invoked his right to counsel when he was questioned by the Camden police, invoked it again a few minutes later when he was questioned by the Pennsylvania police, and the statement was obtained during a third interrogation in which he was not provided with counsel.

C. The motion court made incorrect factual and legal findings.

D. There was no break in Wint's custody.

E. Wint did not waive his request for counsel with respect to the Camden offense.

F. Conclusion.

POINT II
THE TRIAL COURT ERRED IN FAILING TO CORRECT THE PROSECUTOR'S IMPROPER ARGUMENT THAT WINT'S FAILURE TO REPORT HIS SELF-DEFENSE CLAIM TO THE POLICE BEFORE HE WAS ARRESTED WAS PROOF OF HIS GUILT. (Not Raised Below)

POINT III
THE TRIAL COURT ERRED IN REFUSING TO GRANT A MISTRIAL AFTER A JUROR INFORMED THE PANEL THAT SHE KNEW A MEMBER OF THE VICTIM'S FAMILY WHO ATTENDED THE LAST DAY OF TRIAL AND THAT SHE WAS AFRAID THAT HE WOULD RETALIATE IF WINT WAS NOT CONVICTED.

A.

We first address defendant's main argument that the trial court should have granted his motion to suppress the incriminating statement he made to the Pennsylvania detectives when they

12

questioned him in Warminster six months after his initial respective interrogations by the New Jersey and Pennsylvania officers in Camden. In considering defendant's contentions on this issue, we apply well-established principles of appellate review.

In general, appellate courts review a trial court's factual findings from a suppression hearing under "a deferential standard." State v. Stas, 212 N.J. 37, 48 (2012). Our role with respect to the review of factual findings is to consider "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." State v. Johnson, 42 N.J. 146, 162 (1964); see also State v. Elders, 192 N.J. 224, 243-44 (2007) (internal citations omitted). We must bear in mind the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Johnson, supra, 42 N.J. at 161; see also Stas, supra, 212 N.J. at 49.

By comparison, "with respect to legal determinations or conclusions reached on the basis of the facts," our appellate review is plenary. Ibid. For mixed questions of law and fact, we give deference only to the "supported factual findings" of the trial court, "but review de novo the lower court's application of any legal rules to such factual findings." State v. Harris, 181

13

N.J. 391, 416 (2004) (citing State v. Marshall, 148 N.J. 89, 185 (1997)).

### 1.

The key substantive principles of law that guide us on the re-interrogation and suppression issues here were set forth by the United States Supreme Court in Edwards v. Arizona, supra, 451 U.S. at 477, 101 S. Ct. at 1880, 68 L. Ed. 2d at 378, and thereafter clarified by the Court and our own state court in later decisions. Most notably for our purposes here, those post-Edwards decisions include Maryland v. Shatzer, 559 U.S. 98, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010).

In Edwards, the defendant, who had been charged with robbery, burglary, and murder, initially invoked his right to counsel, asking for an attorney to counsel him prior to entering into any negotiated plea. Id. at 479, 101 S. Ct. at 1882, 68 L. Ed. 2d at 382. The following morning, the detectives who had previously questioned defendant visited the jail and asked to talk with him. Ibid. The defendant was told by a guard at the jail that "he had to talk" to the detectives. Id. at 479, 101 S. Ct. at 1882, 68 L. Ed. 2d at 383. After being read Miranda warnings, the defendant waived his rights and provided statements implicating himself in the crime. Ibid.

In reversing the Arizona Supreme Court's finding that the statements were admissible, the United States Supreme Court held in Edwards that

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to <u>further police-initiated custodial interrogation</u> even if he has been advised of his rights. . . . an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is <u>not subject to further interrogation</u> by the authorities <u>until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police</u>.
>
> [Id. at 484-85, 101 S. Ct. at 1884-85, 68 L. Ed. 2d at 386 (emphasis added).]

The Court further noted that, "[h]ad Edwards initiated the meeting [at the jail at which he gave the statements], nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." Id. at 485, 101 S. Ct. at 1885, 68 L. Ed. 2d at 387.

An important aspect of such an inquiry, therefore, is whether the defendant re-initiated contact with the police. Id. at 487, 101 S. Ct. at 1886, 68 L. Ed. 2d at 388. To determine whether a defendant re-initiated such a conversation with the police after invoking his right to counsel, a court must look at whether the

suspect "evince[d] a willingness and a desire for a generalized discussion about the investigation[.]" State v. Fuller, 118 N.J. 75, 82 (1990) (quoting Oregon v. Bradshaw, 462 U.S. 1039, 1045-46, 103 S. Ct. 2830, 2834-35, 77 L. Ed. 2d 405, 412 (1983)).

The Edwards rule has since been applied "to any subsequent interrogation, whether it pertained to the crime that prompted the initial interrogation or to a different crime." State v. Wessells, 209 N.J. 395, 403 (2012) (emphasis added) (citing Arizona v. Roberson, 486 U.S. 675, 683-84, 108 S. Ct. 2093, 2098-99, 100 L. Ed. 2d 704, 714-15 (1988)). The Edwards restriction is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights[.]" McNeil v. Wisconsin, 501 U.S. 171, 177, 111 S. Ct. 2204, 2208, 115 L. Ed. 2d 158, 168 (1991) (quoting Michigan v. Harvey, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180, 108 L. Ed. 2d 293, 302 (1990)).

Another key facet of the Edwards rule concerns the time interval between when a suspect is initially questioned and later interrogated, and, in particular, whether he or she has had what the Court has regarded as a "break in custody." This concept was illuminated by the United States Supreme Court in Shatzer, supra.

In Shatzer, the defendant was incarcerated on an unrelated crime prior to the interrogation concerning the crime at issue in that case. Supra, 559 U.S. at 100-01, 130 S. Ct. at 1217, 175 L.

16

<u>Ed.</u> 2d at 1050. The defendant was questioned in 2003 about the crime at issue, and invoked his right to counsel. <u>Id.</u> at 101, 130 <u>S. Ct.</u> at 1217, 175 <u>L. Ed.</u> 2d at 1051. The defendant was then returned to "the general prison population" without further questioning. <u>Ibid.</u> The defendant was again interrogated about that same crime three years later in 2006, after waiving his <u>Miranda</u> rights. <u>Id.</u> at 101, 130 <u>S. Ct.</u> at 1218, 175 <u>L. Ed.</u> 2d at 1051.

In holding that the defendant's 2006 statement was admissible, the Court explained in <u>Shatzer</u> that the rationale underlying <u>Edwards</u> was that

> subsequent requests for interrogation pose a <u>significantly greater risk of coercion</u>. That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the <u>continued pressure</u> that begins when the individual is taken into custody as a suspect and sought to be interrogated[.]
>
> [<u>Id.</u> at 104-05, 130 <u>S. Ct.</u> at 1220, 175 <u>L. Ed.</u> 2d at 1053 (emphasis added).]

The Court further reasoned in <u>Shatzer</u> that, when a suspect is not released from pretrial custody prior to a subsequent interrogation, that suspect has not "regained a sense of control or normalcy after they were initially taken into custody for the crime under investigation." <u>Id.</u> at 107, 130 <u>S. Ct.</u> at 1221, 175 <u>L. Ed.</u> 2d at 1055.

The Court thus announced in Shatzer a "break in custody" exception to the Edwards rule. It instructed that when "a suspect has been released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation, there is little reason to think that his change of heart regarding interrogation without counsel has been coerced." Ibid. Consequently, the Edwards prohibition on a re-interrogation initiated by police rather than by a defendant did not extend to circumstances in which there had been a sufficient "break in custody[.]" Id. at 109-10, 130 S. Ct. at 1222, 175 L. Ed. 2d at 1056. As a bright-line rule, the Court stated that a fourteen-day interval between the initial questioning of a defendant in confinement and a resumed interrogation of such a person would suffice to protect the defendant's constitutional rights. Id. at 110-12, 130 S. Ct. at 1223, 175 L. Ed. 2d at 1057.

Significantly, the Court in Shatzer emphasized the "vast differences" between "Miranda custody" of a pretrial detainee and the "incarceration [of a defendant] pursuant to conviction." Id. at 114, 130 S. Ct. at 1225, 175 L. Ed. 2d at 1059. The Court recognized that "lawful imprisonment imposed upon [a defendant's] conviction of a crime does not create the coercive pressures identified in Miranda." Id. at 113, 130 S. Ct. at 1224, 175 L. Ed. 2d at 1058. That is because "[i]nterrogated suspects who have

18

previously been convicted of crime live in prison." Ibid. When released back to the general prison population, "they return to their accustomed surroundings and daily routine" and "regain the degree of control they had over their lives prior to the interrogation." Ibid.

Unlike pretrial detainees, sentenced prisoners are "not isolated with their accusers." Ibid. Moreover, their continued confinement is "relatively disconnected from their prior unwillingness to cooperate in an investigation." Id. at 113, 130 S. Ct. at 1224-25, 175 L. Ed. 2d at 1058. Their former interrogators have no power to increase or decrease the length of their criminal sentences. Id. at 113, 130 S. Ct. at 1225, 175 L. Ed. 2d at 1058-59. By contrast, a pretrial detainee who has yet to be convicted and sentenced can be subject to significant coercive pressure from a law enforcement investigator. Ibid.

Our State Supreme Court in Wessells, supra, 209 N.J. at 413, applied the fourteen-day bright-line rule adopted in Shatzer to a situation in which the police had re-interviewed a suspect, who had previously invoked his right to counsel, only nine days after he had been released from custody. The Court ruled that because the full fourteen-day break in custody prescribed by Shatzer had not yet elapsed, "the coercive taint at the initial interrogation had not dissipated and that [defendant's] statements . . . were

19

therefore not voluntary." Ibid. The Justices also determined that the principles of Shatzer were mandatory, and did not amount to mere legal presumptions. Id. at 409-11.

2.

Defendant invokes the tenets of Edwards and Shatzer in contending that the trial court here committed reversible error in admitting into evidence his custodial statement he made to the Pennsylvania investigators in Warminster. First, he argues that the Pennsylvania detectives should not have been allowed to interrogate him in Camden without counsel, immediately after he had invoked his self-incrimination privilege and his right to an attorney when speaking with the Camden officers. Second, he maintains that he did not unilaterally "re-initiate" the lines of communication with the Pennsylvania detectives and that the trial court's contrary finding is not supported by a fair reading of the record. Third, he contends that the court misapplied the law in concluding that a sufficient "break in custody" occurred between the two interrogations in New Jersey and the later interrogation in Pennsylvania because he was continuously a pretrial detainee during that entire time frame.

Taking these sub-points in order, we first focus upon the attempted interview by the Pennsylvania detectives that occurred at the Camden City Police Station on July 31, 2011, immediately after the Camden police had issued <u>Miranda</u> warnings to him and he invoked, in response, his right to counsel. Because of the pivotal importance of this first conversation defendant had with the Pennsylvania detectives, we present the transcribed version[5] in its entirety here.

> DETECTIVE MCDONOUGH ("MM"): How ya doin? Do, do you go by Lance or Laurie or . . .
>
> DEFENDANT ("D"): Yeah, Lance.
>
> MM: Lance? I'm Marty McDonough. This is John Bernardin.
>
> DETECTIVE BERNARDIN ("JB"): John Bernardin.
>
> D: How ya doin?
>
> MM: We're, we're detectives form Pennsylvania.
>
> D: Okay.
>
> MM: I work for the Prosecutor's Office in Pennsylvania. John works for the police department in Warminster. <u>Um, I understand that Camden asked you if you wanted to talk about their case</u>.
>
> D: Mm, hmm.

---

[5] We have also viewed the video recording of the interview, which was played for the trial court during the suppression hearing.

MM:  Um, we're from Bucks County.  There's always two sides to a story.  And what we'd like to do is talk to you about our case.

D:  Okay.

MM:  Um, I'd like to know if you're willin to do that.  There's always, like I said, there's always two sides to a story.

D:  Mm, hmm.  Um, you give, you give me a cigarette, I'll tell you the whole thing about yours because I didn't even know, I don't know the guy.

MM:  Okay.

D:  I really don't know who hired. . .

MM:  Okay.  But let, I have to go through this.  The same thing that Camden did?

D:  Yeah.

MM:  I have to go through it [i.e., the issuance of Miranda warnings] again with you because it's two separate cases.

D:  (inaudible)

MM:  I mean you said you don't wanna talk to them. . .

D:  Because. . .

MM:  And I just have to make sure. . .

D:  They're harassin me.

MM:  What's that?

D:  Harassin me.  Like cops are like tellin the stuff here, like threatening me and stuff.

MM:  Okay.

22

D:  So I don't really wanna talk to. . .

MM:  Okay.

D:  Anybody (inaudible)

MM:  But you're willing to talk to us though?

D:  Yeah.  Cause you guys not from. . .

MM:  No. We're from Pennsylvania.  Obviously, you know you're under arrest.  Right?

D:  Yeah I am.

MM:  We have the duty to explain to you and warn you of the following legal rights.  What I'd like to do is I'm gonna read you each of these and there's a letter next to them. . .

D:  Uh, huh.

MM:  As long as you understand what I explain to you just put your initials next to each letter.

D:  Mm, hmm.

MM:  Okay?  You have the right to [re]main, remain silent and you do not have to say anything at all.  You understand that?

D:  Mm, hmm.

MM:  Put your initials next to A.  Anything you say can and will be used against you in a court of law.  Understand that?  You have the right to talk to a lawyer of your own choice before we ask any questions and also to have a lawyer with you while we ask the questions if you, if you so desire.  Do you understand that?

A-2182-14T3

If you cannot afford to hire a lawyer and you want one, we will see that a lawyer's provided to you free of charge before we ask you any questions. You understand that?

If you're willin to answer our questions, you have the right to stop answering such questions at any time you wish. You understand that?

D: Mm. hmm.

MM: Do you understand all the things that have been explained to you?

D: Mm, hmm.

MM: And what I asked you that question, your answer was. . .

D: What question? Do I understand?

MM: Do you understand all the things that have been explained to you?

D: Yes.

MM: Okay. Do me a favor? Write the word yes there, then put your initials here? Okay, the last question do you wish to speak to us without a lawyer being present.

D: I want him to sit here while we talk.

[Brief interruption when a Camden detective temporarily enters to drop off or retrieve a briefcase.]

MM: I didn't hear. Do you wish to speak to us without a lawyer being present?

D: I want him to sit here while we ta[lk].

MM: You want a lawyer here with us?

24

D: <u>Yeah</u>.

MM: <u>Okay. So, that, that won't happen today because we don't have a lawyer here with you. But if you want one, that, that, that's fine</u>.

D: Yeah.

MM: You're welcome to do that but, um, <u>if you wanted to talk to us today then, then your answer here would be no</u>?

D: <u>No</u>. I would. . .

MM: Or do you want to talk to us today?

D: <u>I wanna talk to y'all but I want a lawyer here present</u> cause I don't, don't. . .

MM: <u>I got ya</u>. I got ya. That, that, that's, if that's your answer, that's you[r] answer.

D: Yeah. So. . .

MM: <u>So, you do not want to talk to us right now</u>.

D: <u>Without a lawyer</u>?

MM: <u>Correct. So you write no there</u> [on the form]. And put your initials there. And do me a favor, sign the, sign this across here?

D: Across that way?

MM: Yep. And just down here put the date and the time. The time is, uh. . .

D: 7[:]30

MM: Yeah.

JB: 9:30.

D: 9:30?

25

MM:  Mm, hmm.  Okay,  So I guess we're done for today then.

D:  Sorry.

MM:  You have any question. . .  You don't have to apologize.  You, you can do what you want.  You have any questions for us?  Okay.

[(Emphasis added).]

The trial court[6] made no specific findings as to whether this first session the Pennsylvania detectives had with defendant in New Jersey was permissible under Edwards and the controlling case law.  Of course, we give due deference to the trial court, including its determination that the detectives who testified at the suppression hearing were credible.  Nonetheless, we conclude as a matter of law that the Pennsylvania detectives' first attempt to question defendant, only a few minutes after they witnessed him invoking his right to counsel to the Camden detectives, violated his constitutional rights.

As the United States Supreme Court made very clear in Edwards, "an accused . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

---

[6] The pretrial suppression ruling was made by a different judge than the one who eventually tried the case.

communication, exchanges, or conversations with the police." Edwards, supra, 451 U.S. at 484-85, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386.

Here, defendant indisputably and unambiguously expressed to the Camden detectives during their attempted interview with him that he did not want to answer questions without having counsel present. Despite that clear invocation of his rights, the Camden authorities allowed the Pennsylvania detectives into the interview room moments later, without telling defendant that he was not obligated to speak with them. Clearly, defendant himself did not "initiate" the back-to-back interview, and the trial court made no such finding. Further, it is undisputed that no attorney was summoned to be present with defendant when the Pennsylvania detectives attempted to question him.

For purposes of this first phase of our constitutional analysis, it is irrelevant that the Pennsylvania detectives had come to New Jersey from a different jurisdiction and wanted to speak with him about a different homicide committed in that state. See, e.g., Minnick v. Mississippi, 498 U.S. 146, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990) (holding it unconstitutional for a county deputy sheriff to interrogate a suspect about a homicide only two days after he had been interviewed at the local jail by FBI agents about other matters and had then invoked his right to have counsel

present, where the suspect had consulted with an attorney but had not initiated the subsequent conversation with the deputy sheriff). See also State v. Hartley, 103 N.J. 252 (1986) (likewise holding that the court must exclude incriminating statements a suspect made to State law enforcement officials after he had been improperly questioned by federal agents who had not administered Miranda warnings to him). As the Court noted in Hartley, despite the fact that the New Jersey officials themselves had issued Miranda warnings to defendant during the second interview, their questioning "on the heels of" the improper earlier interview by the federal agents was "unavoidably tainted." Id. at 284.

We recognize that the video and transcript show that the Pennsylvania detectives approached defendant in a polite and non-threatening manner, and that they did not try to coerce him unfairly into making any incriminating statements. We further recognize that the Pennsylvania detectives confined their discussion to the crime in Pennsylvania, and that they immediately respected defendant's wishes once he made it clear that, although he was willing to talk with them about the Pennsylvania matter, he did not want to speak to them about it at that time without a lawyer present. Even so, the Pennsylvania detectives had no right to initiate any interrogation of defendant, only minutes after he

had invoked his right to counsel in the same interrogation room to the Camden detectives.

For these compelling reasons, we hold, as a matter of law, that it was improper for the Pennsylvania detectives to attempt to interrogate defendant in Camden "on the heels" of his invocation of his rights to the Camden investigators, just as a similar sequence of questioning was invalidated in Hartley. Ibid.

With this key legal infirmity in mind, we turn to consider whether later events nonetheless render the statements that defendant made to the Pennsylvania detectives six months afterwards admissible. In ruling those later statements were admissible, the trial judge largely focused upon two factors: (1) a finding that defendant, rather than the Pennsylvania detectives, initiated the arrangements to interview him in Pennsylvania, and (2) a finding that there was a sufficient "break in custody" between the two consecutive interviews in Camden and the later interview in Warminster.

With all due respect to the trial court's fact-finding role, it is apparent that the record nonetheless reflects that the Pennsylvania detectives, rather than defendant, were the primary, if not sole, initiators of the Warminster interrogation. As recounted by Detective McDonough at the suppression hearing, "as we were leaving [Camden] we explained to [defendant] that we were

trying to file paperwork to bring him back to Bucks and that we would talk to him when he got back to Bucks.  And he acknowledged, yeah, I'll talk to you when I get back to Bucks."  This description by the detective supports defendant's contention that his expressed willingness to resume talking with the Pennsylvania detectives — after invoking to them his right to counsel — was not, as the trial court found, "unsolicited."  Instead, defendant's response in the hallway at the Camden police station mimicked the language contained in the remark the detectives first made <u>to</u> him.

Although defendant had expressed earlier in the interrogation room a desire to speak in Pennsylvania with the Pennsylvania detectives about the homicide case pending in that state, there is no proof that he re-initiated a discussion with the Pennsylvania detectives after telling them he wanted a lawyer.  Instead, the impetus to initiate a discussion after defendant invoked his constitutional rights came from the Pennsylvania detectives.  Given the chronology shown by the record, the trial court's mistaken finding on this discrete point must be set aside.[7]  <u>See, e.g.</u>, <u>State v. Hreha</u>, 217 <u>N.J.</u> 368, 385 (2014) (reversing trial

---

[7] To be fair to the trial court, the hallway conversation in Camden was not recorded or transcribed.  Nonetheless, there is no proof that defendant spoke first to the officers, or that he raised the topic of a subsequent interview without police prompting.

court findings from a suppression hearing where the record lacked sufficient credible evidence to support them).

Viewing, as we must, the record as a whole, we conclude that defendant did not "initiate" his second interrogation by the Pennsylvania detectives. Accord Edwards, supra, 451 U.S. at 484-85, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386. At the very least, there is no evidence in this record that defendant ever told the Pennsylvania detectives before he was taken by them to Warminster that he was willing to answer their queries without having a lawyer at his side.

Moving on to defendant's final sub-point regarding the "break in custody" factor set forth in Shatzer, we encounter additional difficulties. Apparently, neither of the trial attorneys expressly argued to the pretrial judge that, as we noted in Part II(A)(1), supra, the Supreme Court in Shatzer recognized an important doctrinal distinction between the interrogation of persons who are confined due to past convictions, as opposed to persons who are pretrial detainees. See Shatzer, supra, 559 U.S. at 104-05, 130 S. Ct. at 122-210, 175 L. Ed. 2d at 1053.

It is undisputed that defendant was still a pretrial detainee being held in New Jersey at the time he was extradited and brought over to Pennsylvania for questioning on January 18, 2012. The record does not divulge whether he had been assigned an attorney

31

by that point in New Jersey to represent him. He had not yet been indicted in New Jersey. The terms of his detention and whether he had been unable to post bail are not clear. Nor does the present record divulge what defendant's "normal" routine was in New Jersey during that period of his pre-trial confinement. Such details were important to the Supreme Court in its "break in custody" analysis in Shatzer. See id. at 114, 130 S. Ct. at 1225, 175 L. Ed. 2d at 1059 (underscoring the defendant's ability as a prisoner to have regular exercise and recreation, visit the library, receive training and education, send and receive mail, and receive visits twice weekly). None of that information unfortunately is contained in the present record.

Moreover, it is not entirely clear if the Pennsylvania authorities' ability to place coercive pressures on defendant was sufficient here to negate a "break in custody." Id. at 113, 130 S. Ct. at 1225, 175 L. Ed. 2d at 1059. To be sure, the pending homicide charges in Pennsylvania against defendant and another co-defendant likely added to the degree of leverage over defendant while he was confined in the Camden County jail. On the other hand, his principal captors at that time were New Jersey officials, upon whom defendant was presumably dependent with respect to the day-to-day conditions of his confinement.

In sum, the present record is incomplete and inconclusive to enable the Shatzer "break-in-custody" analysis to be resolved definitively. Consequently, we are not in an optimal position to either affirm or reverse the trial court's finding on that important sub-point. For the reasons noted, infra, an amplified break-in-custody analysis is best conducted by the trial court on remand, along with the taint/attenuation issue that we shall now discuss.

3.

The gap in time between defendant's first and second interview by the Pennsylvania detectives bears not only on the aforesaid break-in-custody question, but also implicates issues of taint and attenuation. More specifically, given our conclusions that (1) the Pennsylvania detectives' session with defendant in Camden was improper and (2) defendant did not re-initiate a conversation with them, does the impropriety of that session necessarily taint the detectives' interview in Warminster that followed six months later?

The United States Supreme Court has identified several factors for evaluating whether improper police questioning at an initial session will taint an interrogation conducted at a later time. These factors include the time between the interviews, whether the interview location changed, whether the defendant

33

received adequate Miranda warnings, whether he initiated the second interrogation, the effect on the second session of any admissions made at the first session, and the "purpose and flagrancy of [the] police misconduct." Brown v. Illinois, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261-62, 45 L. Ed. 2d 416, 427 (1975); see also State v. Maltese, 222 N.J. 525, 548 (2015) (applying these factors); State v. Hartley, supra, 103 N.J. at 283 (same). Depending upon how these factors align, a court determines whether a defendant's incriminating statement to police officials comprises the "fruit" of an illegal previous interrogation. See Maltese, supra, 222 N.J. at 549 (concluding that a defendant's incriminating statement to police was the fruit of an earlier unconstitutionally-obtained statement that he made to his uncle, which police had surreptitiously and illegally recorded).

The record on appeal in this case is inadequate to weigh and assess these taint factors. One might infer that the Pennsylvania detectives established a rapport with him during their illegal first session with him in Camden, and that the rapport facilitated their success in inducing him six months later in Warminster to waive his rights and speak to them there without the protection of counsel. On the other hand, even assuming the Pennsylvania detectives should not have met with defendant in Camden after he had invoked his rights, their session with him in Camden in which

he made no inculpatory admissions arguably could be viewed as innocuous and not reasonably something that tainted their future interactions with him. The trial court made no express rulings on these important questions of taint — understandably because it had not determined, as we do here, that the Pennsylvania detectives' attempted interview of defendant in Camden was improper.

The causal relationship between the series of events, or the lack thereof, is not obvious from the record. We cannot tell if, hypothetically, the Pennsylvania detectives had <u>never</u> met with defendant several times in Camden (first in the interrogation room in July 2011, thereafter in the hallway that day, and months later when they came to collect his DNA sample), whether he would have been amenable to waiving his rights and speaking with them in Warminster.

To be sure, as the pretrial judge aptly recognized, defendant appeared quite eager to discuss the Pennsylvania homicide with the Pennsylvania detectives in Camden, but not at that particular time and place. But we cannot readily determine from this record whether that seemingly eager attitude was affected by defendant's perception that he had been mistreated by the New Jersey authorities. Nor can we discern conclusively whether the Pennsylvania detectives, who stressed to defendant that they came

from a different state, unfairly capitalized on the improper opportunity to speak with him immediately after he had aborted his interview with the New Jersey detectives.

Defendant did not testify at the suppression hearing. The questions posed to the testifying officers at the hearing did not delve thoroughly into these critical subjects of cause, effect, and possible taint.

In making these observations, we do not subscribe to the extreme view that defendant's invocation of his Fifth Amendment rights in July 2011 during the interviews in Camden indefinitely and inexorably barred all law enforcement agents from any jurisdiction from attempting to interview him about the crimes during his lengthy period of pretrial detention. Long ago in Michigan v. Mosley, 423 U.S. 96, 102, 96 S. Ct. 321, 326, 46 L. Ed. 2d 313, 321 (1975), the United States Supreme Court cautioned that "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of any opportunity to make informed and intelligent assessments of their interests."[8]

_____

[8] We are mindful that the Court's subsequent decisions after Mosley refined these concepts, resulting, for example, in the "fourteen-

Hence, a careful, case-specific analysis is necessary to determine if the interviews in Camden nullified the interview conducted six months later in Warminster, at which time defendant was duly re-issued <u>Miranda</u> warnings and at which time he agreed to talk to the Pennsylvania detectives without counsel present.

As the New Jersey Supreme Court noted in <u>Hartley</u>, <u>supra</u>, 103 <u>N.J.</u> at 283, issues of taint stemming from an initial improper interrogation "are ordinarily viewed as questions of fact to be determined by a trial court after a hearing." Furthermore, "ordinarily a remand for the purpose of conducting such a hearing and making findings of fact and conclusions of law would be in order." <u>Id.</u> at 283-84. On the facts in <u>Hartley</u>, the Court concluded that a remand was not needed, because the circumstances of the back-to-back interviews at issue there could not "generate a conclusion of sufficient attenuation between the first and second interviews to dissipate the taint." <u>Id.</u> at 284.

In the present case, we find that the remand "ordinarily" prescribed by <u>Hartley</u> would be beneficial. As we have already noted, the trial court did not address questions of taint and attenuation that have now emerged on appeal as pivotal issues. We

---

day rule" for break-in-custody analysis set forth in <u>Shatzer</u>. Nevertheless, the Court's general observation that we have quoted from <u>Mosley</u> remains instructive.

will not presume that what occurred six months earlier in Camden necessarily invalidated the Pennsylvania detectives' interview in Warminster six months later. Instead, the questions of taint and attenuation must be explored in depth on remand at a supplemental hearing, at which both the State and defendant may present additional testimony germane to those matters. In a related vein, for the reasons we have already noted, the trial court must also address on remand the factual information bearing upon the "break in custody" analysis set forth in Shatzer.

At the conclusion of the remand proceeding, the trial court[9] shall issue detailed findings of fact and conclusions of law as to these matters. The court shall specifically reconsider, in light of that analysis and the guidance of this opinion, whether defendant's incriminating statement he made in the Warminster interview should be admitted or suppressed. If the court finds the former, then his conviction shall remain in place. If the court finds the latter, defendant's conviction must be vacated and a new trial shall proceed, at which the statement will be excluded. Either party may pursue appellate review of the remand

---

[9] We recognize that the pretrial judge who presided over the 2013 suppression hearing is no longer serving in the trial court, so a different judge will need to discharge this responsibility, perhaps the judge who presided over the 2014 trial.

determination in a timely fashion, in accordance with the <u>Rules</u> <u>of Court</u>.

In sum, this matter is remanded for reconsideration of the suppression issues and for a hearing on taint/attenuation. Pending the completion of the remand process, the judgment of conviction shall remain in force.

B.

Although we need not reach the two remaining points raised on appeal by defendant, we address them very briefly for sake of completeness. Neither of them have any merit.

First, we find no basis to set aside defendant's conviction because of his claim that the prosecutor made unduly prejudicial remarks during summation. In particular, defendant complains, for the first time on appeal, that the prosecutor unfairly argued to the jury that he should have waited for the police at the scene of the shooting if indeed his conduct was innocuous. We discern no impropriety in this line of argument, which was a fair attempt to impeach and negate defendant's trial testimony asserting self-defense. <u>See</u> <u>State v. Brown</u>, 190 <u>N.J.</u> 144, 159 (2007) (noting that a defendant's pre-arrest silence or conduct is admissible "for the limited purpose of impeaching [that] defendant's credibility"); <u>State v. Brown</u>, 118 <u>N.J.</u> 595, 613 (1990) (further noting that "evidence of pre-arrest silence, particularly in the

absence of official interrogation, does not violate any right of the defendant involving self-incrimination"). Moreover, the trial court in this case issued an appropriate limiting instruction on the point after the State cross-examined defendant about his pre-arrest conduct. Defendant identifies no deficiency in that instruction, and nor did his trial attorney.

Second, we are unpersuaded by defendant's claim that the trial court should have granted his counsel's motion for a mistrial after two jurors were dismissed and replaced by alternates during the deliberations. One of the two jurors had recognized a member of the victim's family in the audience, and she thereafter mentioned that observation to the other jurors. One of those other jurors expressed misgivings to the court about continuing to serve.

We are satisfied from the circumstances presented that the trial court acted appropriately to ameliorate any potential prejudice arising from these events and that it safeguarded defendant's right to a fair trial and a fair jury. The court performed a voir dire of all of the remaining jurors individually. Other than the two jurors who were excused, none of them expressed qualms about continuing with the deliberations. Nor is there any evidence that the jurors were exposed to extraneous evidence. The court's inquiries sufficed to assure that the deliberating jurors

would be unaffected by the events that led to the removal of their two colleagues. See State v. Jenkins, 182 N.J. 112, 124 (2004) (discussing the applicable standards for juror substitution). Defendant has not demonstrated that the trial court abused its discretion in its handling of these juror issues; State v. Musa, 222 N.J. 554, 565 (2015) (requiring such a demonstration).

All other arguments presented by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

### III.

Affirmed in part, and remanded in part for reconsideration and further hearing on the suppression issues. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION